2369 Good morning Good morning, my name is Ugo Uzo and I represent the appealant. Here is our contention that nothing in the record supports the District Court's conclusion that the police officer defendants in this case had probable cause to arrest and prosecute Mr. Harry for shoplifting. Rather, based on the record, what we have on the record is the fact that Harry was identified as someone... Well, that's usually enough. So if a security guard at the store sees a number of different people who are engaged in shoplifting and with respect to this particular case identifies that person, one of those people, to the police, why isn't that enough? Well, you know, I'm thinking about DeFault against City of New York. In this case, there were several people engaged in an activity but this court still requires, for probable cause determination, this court still requires you to identify, you know, particularize the guilt to the individual being arrested. Here there were approximately six individuals who entered into a store. That was really the end of shoplifting. The complaining witness was brought to the location where Mr. Harry was held and the police simply asked the complaining witness, please look to the right, see if you recognize someone. Now, at that point in time, the police already knew the particular items that were removed from the store. It was not as if all the individuals were engaged in the shoplifting activity. Here the police would be required to identify the particular crime that Mr. Harry committed. And this was Addison. Eventually... Mr. Kuska says that the employee says this is the person, one of the people who engaged in the shoplifting, who were engaged in shoplifting. In answer to that question, he identifies your client, no? You and Addison, the question that Mr. Kuska was asked was look to the right, see if you recognize anyone. And the police officer who actually conducted the, uh, the, uh, the, uh, the show up did not actually know the reason why my client was stopped. So she could not have, you know, been able to ask Mr. Kuska whether my client was involved because she had no idea the reason why my client was stopped in the first place. But did Kuzo tell, um, uh, either Fernandez or DeCillier that, uh, your client, apart from being apparently in this group of other people, took something? No, Your Honor. What did he tell him in that regard, uh, uh, in the initial call? Well, there was a 9-1-1 call, Your Honor. Right. Um, there, I mean, it's really difficult reading 9-1-1 calls to begin with, but because information had been provided and a lot of times it's very difficult to identify. I understand all that, but I'm trying to divine exactly what, um, uh, what the, uh, arresting officers knew about your client specifically. And second of all, uh, when, when your client was down at the station and they were, uh, prosecuting the arrest, talking to, uh, Fernandez, I think it was, what specifically had been told about, uh, your client's behavior? Right. If you understand the record. Right. Your Honor, I'll start with the 9-1-1 call. We're not denying there was a 9-1-1 call, that there was lawsuit in progress, six people were mentioned, there was no... What do you mean got mentioned? Well... Your Honor, did, did, uh, anyone say that, you know, the man who was six foot three with the, uh, distinctive sweater, uh, uh, was among, was, was one of the people taking things or was one of the people in the room? No, Your Honor. No, what? It did not say that he was one of the people who removed items. It just says six, six, six individuals, they left, uh, they left the store, and items were missing. But more importantly, before... But it identifies someone who matches your client's description, no? My client's description was given, but he never said, Your Honor, that he removed any items. Okay. But he had, is there any evidence that he did not have, Mr. Harry did not have the, uh, booster bag from the H&M booster bag? It is our contention that Mr. Harry, based on the record, did not, was not in possession of any booster bag at the time he was arrested. In fact, Mr. Hernandez, Mr. Hernandez testified that... Mr. Hernandez, the police record shows that he claimed that he observed my client drop the H&M bag that he held at the time when he was stopped, and that he observed him drop it, and that he himself recovered it. But during his deposition, he was questioned, um, and he testified that he no longer remembers whether he was the one who recovered the booster bag, or was it, whether it was another officer that recovered it. But he was clear that he vouched it. But my, Mr. Harry himself was clear that he was returning his girlfriend's item, and he had that item inside the H&M bag at the time when he was stopped, and that Mr. Hernandez took, that removed that bag from him, that he held onto it before, uh, at the time when Mr. Hernandez removed it from him. You know, but if I may get back, Your Honor, to your initial question, the, um, the, uh... What do you believe the record shows that, uh, uh, Fernandez and, uh, Delisser had learned from, from Cuozo? Right, Your Honor. There was nothing... By the time my client was handcuffed, they knew because the complaining witness told them that there were particular items that were removed, and that was Addison. Then, after my client was arrested and transported to the precinct, what my client told them was that Mr. Harry came in with other individuals. They looked around, and one of the individuals who came in with Mr. Harry ran to the Tommy Hilfiger, uh, um, display area and swept that area and ran out. Right. There, well, there's no indication in the record at any point in time that my client, Mr. Harry, was engaged in any shoplifting or that he left the store with any stolen item. Now, what, after, and that was even in, uh, Mr. Fernandez's memo book, where he documented information he received. But now, after the fact... What was in Mr. Fernandez's memo book, as you, uh, understand the record? That Mr. Harry came in with a group of individuals, and one of the individuals who entered the store with him ran to the Tommy Hilfiger display, uh, and removed items and ran out. And this was, uh, a consequence of Fernandez talking to, uh, uh, Kuzco? That is correct, Your Honor, because they actually transported Mr. Kuzco to the precinct and interviewed him. And so what did Kuzco say at the precinct? What Mr. Fernandez put down in his memo book, that Mr. Harry came in, looked around with other individuals, they looked around, and one of the individuals who came in with him ran out to a different section and grabbed items and ran out of the store. And eventually everybody left without incident. And Mr. Kuzco himself actually also prepared an incident report for the store he was working for at the time, and his information, what information he put down in the incident report was the information that he gave Mr. Fernandez, uh, Officer Fernandez, that Officer Fernandez put down in his memo book. Is there anything in the record that establishes whether or not your client knew the other people? No, Your Honor. And there is really nothing about the identity of the other people. And we actually disputed, well, it's not really relevant here anyway, but Mr. Harry actually entered that store by himself. He did not enter the store with any individual for whatever reason. Um, Officer, um, the, Mr. Kuzco, the complainant, lumped them all together, but they did not enter that store together. But that's, that's beside the fact. Let me ask you about this booster bag that Judge Park asked about. Um, you say you don't think it's a booster bag. What do you say about the booster bag? My client was very clear at the deposition that it was not a booster bag. Is there anything, you know, you both know the record better than I do, but my recollection is that when they got to the police precinct, um, there was, there was this H&M bag, but there was no foil inside. Your Honor, the record, the record is not really clear to that, um, whether exactly there was any foil in it, but the Officer Fernandez did himself claim that he vouched that H&M bag with foil inside. And was that, was the fact that there was tin foil inside, you know, we use this term booster bag. I mean, I'm not even sure what that is, but it seems determinative that whether the fact that there was tin foil inside, um, constitutes something that's used by shoplifters. Would you agree with that? Right. Would you agree with that? That is, yes. That's the conclusion reached by the police. Is the fact that there was tin foil inside the H&M bag, was that itself disputed? Or was it at a more general level, one, the, Fernandez says this is a booster bag, and your client says, no, it's not. And we can have a disagreement about what a booster bag is. Right. My client, my client's testimony is that- Not a booster bag. It wasn't a booster bag. Okay, but he doesn't say it didn't have tin foil in it. No, he did say that the only item- Where does he say that? He's, in his deposition- Where does he say that? You know, I'm sorry, I couldn't point it out, but he's on the record. I looked for that. My law clerk looked for that. I couldn't find that. I apologize, you know. And what you just said in answer to an earlier question was, you know, tin foil seems to be, the fact that tin foil is in a bag, seems to be somewhat determinative. Well, you know, I would not necessarily say that tin foil being in a bag would be determinative of whether the police had probable cause to arrest him or not. I mean, they could arrest him for possession of a bug larry instrument. But he'd been arrested before that, right? He'd been arrested on the street. He was arrested on the street and eventually- And taken to the prison. And taken to the prison, but Officer Fernandez claimed that he observed him drop- The booster bag was examined to the extent that it was after he'd been arrested at the station. Right, there's no indication that, well, at least as far as I can tell from the record, that the police knew right away that it was a booster bag, regardless. But what Mike Lyons claimed means anyway that he was not lying with tin foil, that he did not specifically say tin foil because it was- I didn't see that. Because what he did say was- It says it's not a booster bag. You might be able to find it. When you come up- Your Honor, I apologize, but I do remember that he testified that he contained, he did not contain anything else besides- Leggings. His girlfriend's leggings. Yeah, but it doesn't say, I mean, yeah, no other merchandise besides the girlfriend's leggings. He doesn't dispute that the bag was lined with tin foil. I don't believe that that question was asked. No, I know that. I'm not asking that. But there's no- We don't know whether the bag, in fact, was lined with tin foil from this record. Isn't that right? Right, Your Honor. Besides Officer Fernandez, it's disputed- He's saying that it was lined with tin foil. I'm not sure he said- It is a disputed issue of fact. I've never said, Your Honor, I didn't say that it was lined. George Park did ask me whether that would make a difference. And I was trying to explain that my client's claim is that it was actually not lined with tin foil, that it was actually not a booster bag because it contained the girlfriend's leggings. We'll hear from your friend on the other side. And then you reserve some time for rebuttal. Thank you. All right, can you clarify this? With respect to the booster bag- Well, go ahead. Okay. Go ahead. Start. To start from the beginning, this is Tara Sedgwick appearing on behalf of the City of New York. Plaintiff tries to draw a lot of fine distinctions, but there are no real genuine issues of fact on any material issue. With respect to the false arrest, the police officers had probable cause to initially detain a plaintiff based on him matching the description that was called over the 9-1-1 regarding a larceny in progress and his location in the direction where the- There's no question that he was one of the people in the store. He matched the description. He was found a short ways later. Yes. But the issue, to my mind, is was he identified as someone who was stealing stuff from the store? Like the people who were sleeping the Tommy Hilfinger merchandise? Or was he among a group of people who were in the store? Apparently he came after the group and left before the group. I don't believe that the- I apologize. The record doesn't support that version of events. In terms of the initial arrest- If the police had just simply said there was a group of people in the store, about half a dozen of them, one of them stole merchandise, one of them was 6'3 and wore a distinctive sweater, would that have given probable cause to arrest him? Well, that would not if that was what he said. If what had been reported was that there was just a group of people- If what had been reported was what I just mentioned- There's a group of people in the store and one- They look like- And one person was stealing and the other, nobody else was doing anything. There's a group of shoplifters in the store. One person stole something, another person was 6'3 and had a distinctive sweater. Okay. So I think what was- Would that have given the police probable cause to arrest the guy with the sweater? I think that it depends if the group was acting together to steal merchandise. And so if they are in fact a group of shoplifters and he is part of the group of shoplifters, then I think that there is probable cause to arrest. And what was reported over 9-1-1- What would make someone part of a group of shoplifters as opposed to a shopper? Well, I mean, in this particular case- In this case. In this particular case, the testimony of Cusco was that they had all- They all ran in together and they went to- Over the course of like two to three minutes at maximum, they went to different parts of the store and they grabbed things. One group grabbed this Tommy Hilfiger item. A plaintiff grabbed this cap of merchandise. Are you telling me that's what was told to Fernandez and Gillespie? At the precinct. I mean, at the scene, they had the information that was called over the 9-1-1 that there was a larceny in progress. There was a group of six people who had been- Who were stealing things. He was identified as one of the people who was part of this group. And he had gone to the- Had fled towards First Avenue. He was apprehended as matching the description of one of these people who was part of the shoplifting group in the direction that he was- Where he was found. The- Cusco then came around and identified him as being- Is any of that in Fernandez's statement? I beg your pardon? Is any of that you just told me in Fernandez's statement? I mean, I believe that- You mean in the deposition testimony? I mean, or in- In terms of the- The statement that Fernandez took at the police precinct. The statement that Fernandez took at the- I mean, what we have in terms of a- The written statement that we have from the police precinct is- We have the complaint. The criminal complaint. And that was based on his conversation. We have- I mean, there was some jotting that he made down- He wrote down on his- Like a flysheet of his memo book about some of the details that were stated. He doesn't have- He doesn't have a written statement aside from the complaint. Are you sure the information you were giving me- Yes. Largely comes from his deposition? It comes from his- Well, yeah. I mean, it comes from his deposition except for- Well, on the jotting on his- On the back of the side of- The flysheet of his memo book. He wrote that he had grabbed CAPA. And which was then- Fernandez testified that this was about merchandise. This was a type of merchandise. And that was what Cusco had said was- And that he gave- That the manager was able to get it back. Or get $200 of it back. Or something along those lines. And in the statement- I'm sorry. The data sheet that the DA wrote down from his conversation with the- With the arresting officer. Which he had gotten from Cusco. So this is what he said. Was anything recovered from Harry? There was no merchandise recovered from Harry. And there wasn't any- So, yes. No. There was no merchandise recovered from Harry. I think the theory was that he was operating as part of a group who had come in. They had gone and they were taking merchandise. He did not succeed in- I mean, based on this record, he did not succeed in actually taking merchandise out of the store. Based on this record, you mean that the CAPA merchandise was- What happened to that merchandise? I mean, it appears that the- It's not entirely clear whether or not- How it was that the manager got the CAPA merchandise back. But it- And where in the store it was that he got it back. Those kinds of details are not clear from this record. But based on the entirety of what we have, it seems that there was- From what Cusco testified, there was a group of five or six people who ran in, who split up, and who grabbed things. And then they were running out, but the manager got the stuff back from- The CAPA merchandise back from plaintiff before he ran out. But he was part of this group that ran out. And what the- So this is what the officer, at the time that he was speaking with the DA, this is what he told him, that he was part of this group, and that was- And in evidence, at summary judgment, just so that I'm clear, we're focused on what information was available to the officers. During the time of the arrest, they have a 911 call with a description. They see somebody- I think maybe this is in evidence, but somebody can correct me if I'm wrong. They see Mr. Harry, who fits that description. And then in addition to that, Mr. Cusco comes out and says, that's one of them. And he's carrying an H&M bag at that point. And that's the evidence for the arrest. Right? And that's the basis on which you argue that there's probable cause. Yes, that's- So then there's this malicious prosecution claim. And maybe this goes to the earlier questions. He is also, that is Mr. Harry, charged with having burglar's tools. Yes. The burglar's tool, in this case, as I understand it, is the- H&M bag, yes. The H&M bag. And the only thing that is in evidence, but again, you correct me if I'm wrong, and Mr. Rousseau can correct me if he thinks I'm wrong, is the following. Officer Fernandez says, I saw this bag, there's none of the merchandise in it, but there was lime with tinfoil, and that is a signal that this is a booster bag. Yes. Okay. Yes. So tinfoil was recovered with the bag? That's, our position is that yes, is that it was a, is that the, I mean that bag lined with tinfoil was vouchered, and there are references in all of the police work to the bag. So this record, if I go back, will establish that there was a H&M bag with tinfoil. So why do- This record, when I go back, will establish that there was an H&M bag with tinfoil. Correct? It will establish to the, I mean, unfortunately the actual voucher is not in the record. This bag will establish, But yes. This record will establish that you, your clients vouchered an H&M bag with tinfoil. Correct? Yes. I mean, I'm not sure if it was referred to as a booster bag as opposed to an H&M bag with tinfoil. An H&M bag with tinfoil. I'm not certain how it was phrased, but yes, it was, it was, it was vouchered. Yes. Some bag with tinfoil, something with tinfoil in it was vouchered. Yes. Yes. And, and, now, Mr. Uzum says that his client, well I know that his client says it was not, it's not, I didn't have a booster bag. Yes. And there was an exchange that you heard, a colloquy, where I asked, well, does he separately, and more concretely or discreetly, dispute that the bag that he had was lined with tinfoil? Are you aware of anything in the record where he says that, where he disputes that? No. The only, I, in his affirmation, affidavit in opposition to the motion for summary judgment, he states that he did not have a booster bag. But he does not make a separate statement regarding aluminum foil or tinfoil. And is, and is it your contention that he needed to more concretely dispute that? Or is all that he needs to do to defeat summary judgment on, at least this burglars tool charge, the malicious prosecution charge, is it that all he needs to do is dispute that he had a booster bag? That it was a booster bag? Because he does dispute that. I think that given the fact that there is all of this, you know, all of this evidence that, you know, that the, that the bag was vouchered, and, you know, that, I mean, I think that it is also something that there was no, nothing in, in the complaint to say that this booster bag was, was fabricated. It's something that he's, you know, only raising in, in opposition to the summary judgment motion. I think that there should have been, there should have been something more, yes, that there should have been something more specific in terms of... So we have said that, you know, if you have a non-contradictory testimony in the form of a sworn declaration, even though it appears after a summary judgment motion has been filed from a, from a plaintiff, that's, that's enough to create a genuine factual dispute and defeat summary judgment. Now, you know, what I'm trying to get at is the levels of generality, but you're making a separate point, which is that, you know, it's self-serving, it's after the fact, but that, that doesn't, that doesn't help me solve your problem. I, okay, with respect, I mean, it is, specifically with respect to a malicious prosecution, with respect to the charge of burglar's tools, our, our position, I mean, is that he needed to do, have some greater levels of specificity than just saying I don't, I didn't have a booster bag. But, I mean, certainly he, certainly there is probable cause to proceed with the, with the petty larceny claim, based on the information that the officers had. And I would say, with respect to that, Isn't that, isn't that charged, the burglar's tools charge? There are two separate charges. There's two separate charges that are, Petty larceny and the possession of the burglar's tools. Okay, so I'm focused on, I'm just focused on the burglar's tools. Okay. So you're, and you, you glided by that, and now I think you're suggesting that maybe, depending on the level of generality, maybe there is a dispute. A factual dispute. I, I mean, I think that there, there is a factual dispute in that plaintiff states in his affidavit that he doesn't, that he didn't have burglar's tools. What I'm saying is to create a genuine, a genuine issue of fact, given the fact that there was all of these references and everything to the, the booster bag being vouchered and everything that, and that this was, and the statement that this was an H&M bag that was, in the criminal complaint, that it was a booster bag lined with, with aluminum foil, that there should have been something. So let me give you a scenario. Police officer say, I saw this person, I saw the defendant in the car, the criminal defendant in the car, he drove off, he did X, Y, and Z, and there's all this deposition, all these depositions and so on, and for whatever reason, the defendant is not himself ever deposed, and in response to a motion for summary judgment, he says, that was not me in the car. Is that not enough to generate a genuine dispute, factual dispute? I mean, I think that, I mean, I think that in general is where, you know, where a police officer has vouchered items of contraband, and the, then, I mean, courts have found that something more is needed to contradict that than just saying, I didn't have it. What's the difference between a shopping bag with some aluminum foil inside it and a burglary? Well, I mean, my, I mean, I'm a police officer, so I'm not so familiar with these, but my understanding is that it's, is that, I mean, that the bag is lined with the aluminum foil rather than like having a roll of aluminum foil in it. I don't know if I'm understanding your question. I thought until I started on this case that I had a pretty good understanding of what a burglary tool is, but now I'm getting a little bit confused and I'm just asking you to help me. Okay. My understanding, which is based entirely on the record of this case, is that the lining the bag with aluminum foil interferes with the, yes, interferes with the sensors, and so that's why it's considered a burglar bag, a booster bag. And there doesn't seem to be a dispute about that. No, I don't. My only question is, you know, if after a summary judgment motion is filed, the one side says no. Yeah. That seems to be, under our case law, enough, but you're suggesting that I'm wrong about that. I, my understanding is that if the paperwork is consistent, then you, then usually that something more, a more detailed statement in opposition is necessary as a contradiction rather than just a denial. This is not a videotape situation. This is not one of those, this is just vouchering, and as we know, vouchers are sometimes wrong. I think you'd acknowledge that. Okay. Thank you. So... The city dropped all the charges at some point, right? Yes, in the... At what point? It was, it was several months later. I mean, I can't remember now exactly the date. But they dropped all the charges. But all charges were eventually dismissed, and yes, and Plaintiff was never in custody following arraignment. He was released on his own recognizance. So it was just a matter of attending court dates. We don't know why the charges were dropped. I am not certain. Thank you very much. Thank you. Thank you. Thank you. If I may start with your last question, the charges were dropped because the prosecutors concluded that they were not going to be able to prove the case beyond reasonable doubt. And that was the basis for dropping the charges. And also, I believe the case was dismissed in February of 2019. That was several months after the arrest. And you're right as well. The... I apologize initially. I didn't think about that. But the... Mr. Harry actually disputed that he had a booster bag within, in the affidavit that he filed. And it was just not put out of clear. That dispute wasn't just put out of clear because already from the record, there were issues with the poor booster bag scenario. Officer Fernandez, in his police paperwork, stated that he observed Mr. Harry drop the bag and he immediately scooped it up and bow-shot it. And at his deposition now, he's claiming that, no, actually, I don't remember whether I was the one who did it or it could have been one of my colleagues who picked up the booster bag and then handed it over to me. So, already, Officer Fernandez is not sure. The chain of custody issue, whether it was actually the same bag that someone handed him over that he ended up vouchering or whether, you know, whether it was something that was picked out from somewhere else. That, we don't know from the record. If I may go back to what the defendants are claiming, there's nothing in the record that indicates that Harry was acting, Mr. Harry was acting in concert with anyone. Obviously, he wasn't charged with acting in concert. He was never charged with eating and debating anyone. I can't possibly be correct. Mr. Cusco says he was one of six people and identifies him as one of the six. So, that's part of the record. It's disputed. He was identified and we're not denying that he was identified as someone who was in the store. But the question is when he entered the store, what did he do? And there's nothing in the record that indicates that he did anything with any of the six people. Mr. Cusco said that he was one of the six people who was engaged in a spree to shoplift. That's in the record. That's not the way Mr. Cusco actually put it. He describes your client as one of the people and he says how tall he is and items of clothing. I'm not denying. My client is approximately six foot five or so. It's very easy to pick him out. I'm not denying that Mr. Cusco at the scene where my client was arrested said yes that he recognized him. Your position is that Cusco didn't say anything more than the person who fit this description, your client, was in the store with the five other individuals. Is that right? That is correct, Your Honor. I couldn't find any record of Cusco telling anybody that, and I could be wrong, you know the record better than I do, telling anybody that your client was stealing like at least one of the like a person who cleared off the Tommy Hilfiger. Well, because it never happened. There's nothing in the record that shows that my client did anything in the record. Wait, I may have misspoken. Didn't the Cusco stop your client when he was leaving the store and retrieve merchandise from him? No, Your Honor. No, Your Honor. Mr. Cusco's incident report, he did write that my client, Mr. Harry, had some copper merchandise but because the manager was next to him, he gave it back to the manager. But at his deposition, actually, Mr. Cusco wasn't clear whether he did not remember observing my client remove any item from the store. He testified that my client actually walked down to the basement of the store. All the other individuals that he claimed came in with my client remained on the first floor of the store. My client walked down to the basement of the store. And at some point he observed my client and the manager, and he had no idea whether my client intended to buy whatever item that he thought that he saw him hand over to the manager. And this is located in his deposition? Yes, Your Honor. Everything is included in the record. Based on the record here, Your Honor, there is nothing that connects Mr. Harry to the alleged shoplifting that happened, and there was no probable cause to arrest him and even to prosecute him because the position that was later provided in this case was approximately two weeks down the road. It contradicts just about every other information in the record. So I'm reading, I'm sorry, but I'm reading Mr. Kusko's deposition 228. He's talking about your client and the other males. And do you know where the cap of merchandise was located at the time? I can't recall, and I believe he was one of the males that is based on your report that was trying to grab the cap of merchandise, correct? This is about your client? Yes. Yeah, is the answer. And that's at 228. But maybe I'm misreading that? I'm sorry. I apologize. You know, Mr. Kusko, to my recollection, his testimony was really that my client was there. He might have said I'm not sure how or whether he was in response to a defense counsel's question that he was responding to and based on the way I'm looking at 228. I don't know if you can give me a second. Maybe I've got that wrong? If you don't mind my accent, there are four pages on 228. So I'm just, yeah, really, well, if you go back, I'm sorry, to the page 87, 88 of the transcript. So 227. 227. And then 89, 90. But I'm... Well, you know... I think he's talking... I'm pretty sure he's talking about your client. I'm looking at this. I'm looking at page 88. Do you know where the other males were located at the time when they were trying to grab stuff? I can't recall. So, I mean, for me, the summary of Mr. Kusko's... You continue that you observed him grab a bunch of cap and merchandise, correct? Answer, yes. I think that that's referring to your client. I mean... Yes, Your Honor, that was in his incident report. No, but this is a deposition and in answer to Judge Parker's question, you said there's no evidence that Mr. Kusko saw your client grab anything, but here's the deposition testimony. We're belaboring this. I just want to make sure that I have not misunderstood something. No, Your Honor, you're not. That was actually... We were reviewing the incident report he prepared. This was in response to the incident report. But eventually, if you continue reading, Your Honor, eventually he testified that he did not actually observe my client, so it's on the record. I'm not... I'm not trying to create more work for you than you already have, but it's on the record because I deposed him. He did testify that he actually did not remember because my client went to the basement, that ultimately he observed him and the manager standing, and he had no idea whether whatever merchandise that he had with him that he intended to buy it or whatever it is. Thank you very much. Is this going to camp, that is, the mediation at all? Yes, we did. There was a mediation. The city obtained... The city indicated that it was a no-pay case. Thank you. Thank you very much. Thank you.